NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 230776-U

NO. 4-23-0776

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 24, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* E.N., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Winnebago County |
| Petitioner-Appellee, | ) | No. 21JA210 |
| v. | ) | |
| Theresa R., | ) | Honorable |
| Respondent-Appellant). | ) | Francis M. Martinez, |
| | ) | Judge Presiding. |

_____

JUSTICE LANNERD delivered the judgment of the court.
Justices Steigmann and Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed the judgment of the trial court terminating
respondent's parental rights because the court's fitness and best interests findings
were not against the manifest weight of the evidence.

¶ 2    In July 2023, the State filed a petition to terminate the parental rights of respondent,
Theresa R., to her minor child, E.N. (born November 2020). Timothy N., E.N.'s father, signed
specific consents for adoption in June 2023 and is not a party to this appeal. Following a hearing
on the State's petition, the trial court found respondent was an unfit parent under the Adoption Act
(see 750 ILCS 50/1(D)(b), (g), (m)(ii) (West 2022)) and termination of her parental rights would
be in E.N.'s best interests. Respondent appeals, arguing the court's fitness and best interests
determinations were against the manifest weight of the evidence. We disagree and affirm.

¶ 3                              I. BACKGROUND

¶ 4    On May 14, 2021, the State filed a petition alleging E.N. was a neglected minor in

that her environment was injurious to her welfare pursuant to the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2020)). Respondent was appointed counsel and, after the trial court admonished respondent on the State's petition, she waived her right to a shelter care hearing. The court entered a written order, finding "respondent[ ] knowingly and intelligently waives his/her/their right to a hearing on whether there is probable cause to believe that said minor is a person subject to the Juvenile Court Act as neglected." It awarded temporary custody and guardianship of E.N. to the Illinois Department of Children and Family Services (DCFS) and set the case for an adjudicatory hearing on August 3, 2021.

¶ 5　　　　On the day of the adjudicatory hearing, respondent stipulated to count I of the State's petition and waived her right to an adjudicatory hearing. That same day, respondent also waived her right to a dispositional hearing and stipulated she was currently unfit, unwilling, or unable to care for E.N. Based on respondent's stipulations, the trial court found E.N. to be a neglected minor and found respondent "[was] not fit or able at this time, but is willing." It awarded custody and guardianship of E.N. to DCFS and ordered respondent to cooperate with all services recommended by DCFS.

¶ 6　　　　Approximately two years later, on July 27, 2023, the State filed a petition to terminate respondent's parental rights pursuant to the Adoption Act. The State's petition alleged:

> "The respondent mother, Theresa R[.], is an unfit person to have a child in that:
>
> COUNT 1:
>
> She has failed to make reasonable progress toward the return of the child to the parent, during a (9) nine-month period following the minor being adjudicated neglected or abused, to wit 7/15/2022 to 4/15/23 and/or 9/26/2022 to 6/26/2023. 750 ILCS 50/1(D)(m)(ii).

COUNT 2:

She has failed to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare. 750 ILCS 50/1(D)(b).

COUNT 3:

She failed to protect the minor from conditions within the environment injurious to the child's welfare. 750 ILCS 50/1(D)(g)."

The trial court set the matter for a hearing on the State's petition to terminate. The fitness portion of the hearing occurred on August 10, 2023, and the best interests portion occurred on September 5, 2023.

¶ 7                                      A. Fitness Hearing

¶ 8        At the outset of the fitness hearing, the State requested the trial court take judicial notice of the following documents: (1) the neglect petition filed May 14, 2021, (2) the temporary custody order filed May 14, 2021, (3) the adjudicatory order filed August 3, 2021, (4) the dispositional order filed August 3, 2021, and (5) the permanency review orders filed December 16, 2021, July 15, 2022, December 1, 2022, and June 26, 2023. The State then offered into evidence a certified copy of the indicated packet, without objection. Following the admission of the indicated packet, the State presented testimony from Meliza Lester.

¶ 9                                 1. *Testimony of Meliza Lester*

¶ 10                                      a. Direct Examination

¶ 11        Meliza Lester, a DCFS caseworker, was assigned as respondent's caseworker in April 2022. According to Lester, E.N. "came into care" in May 2021 due to domestic violence in her home and respondent's substance abuse issues. As part of Lester's duties as a caseworker, she created service plans every six months, which detailed "what services need to be completed [by

- 3 -

the parents] for return home of the child." Respondent was assigned the following services: general cooperation, substance abuse treatment, mental health services, domestic violence services, and parenting/visitation. Throughout the pendency of the case, respondent was informed she needed to complete these services in order to have E.N. returned to her.

¶ 12    With respect to her mental health services, respondent was referred for individual counseling, eye movement desensitization and reprocessing therapy (EMDR), and psychiatric monitoring. Respondent attended individual counseling; however, Lester had concerns after speaking with respondent's therapist because respondent was misrepresenting the progress she had made toward a return home goal. Additionally, while respondent was initially attending EMDR, she stopped attending in November 2022. Subsequently, respondent reengaged in EMDR in January 2023, but her attendance remained inconsistent. Overall, respondent failed to successfully complete any mental health services.

¶ 13    Respondent was assigned domestic violence services due to Lester's "observations during the life of the case, of [respondent's] relationship with her paramour, and case opening, and prior cases with domestic violence." As part of these services, respondent attended a domestic violence education group and a social support group for domestic violence victims. Although respondent attended these groups, Lester could not say respondent successfully completed domestic violence services due to ongoing concerns about her relationship with her paramour, Nicholas L. Respondent's relationship with Nicholas was particularly concerning because the initial incident when Nicholas perpetrated domestic violence against respondent caused E.N. to be removed from respondent's care. Additionally, while not a party to the case, if respondent desired to maintain her relationship with Nicholas, he would need to engage in services. However, he failed to engage in services until mid-2023. Lester admonished respondent multiple times that her

relationship with Nicholas "could hinder her return home goal," but respondent continued her relationship with him.

¶ 14 As part of her service plan, respondent was required to complete a parenting class and "demonstrate appropriate parenting skills" during visits with E.N. Respondent successfully completed the parenting class and received visitation with E.N. for approximately 10 hours a week. At one point, respondent received unsupervised visitation with E.N.; however, it was later returned to supervised visitation due to Nicholas being present at several visits when he was not an approved participant for visitation.

¶ 15 Overall, as of the date of the fitness hearing, respondent still had multiple services she needed to complete, including individual counseling and EMDR, obtaining a safe and appropriate house for E.N., and attachment/parenting counseling. Lester testified, although respondent completed some services, she still had concerns about respondent's ability to parent E.N., due to respondent's "judgment, [lack of] protective parenting, her mental health, *** the slow progress in services, [and] not making progress."

¶ 16 During the direct examination, the following exhibits were admitted without objection: the integrated assessment dated June 14, 2021, and service plans from May 13, 2021, October 20, 2021, April 21, 2022, August 24, 2022, November 21, 2022, May 11, 2023, and May 16, 2023.

¶ 17 b. Cross-Examination by Respondent's Counsel

¶ 18 Lester acknowledged respondent was cooperative with DCFS and participated in family recovery court, which is a voluntary program "to monitor families that have substance abuse issues." During respondent's time in family recovery court, she did not have any positive drug screens. Moreover, respondent consistently attended her individual counseling and Lester received

an update from the counselor, which noted respondent was "making tremendous progress." However, Lester found out after this report that respondent was misinforming her counselor about her progress in the case and misrepresenting the reasons E.N. came into care. While respondent attended a victim social support group and completed a domestic violence education group as part of her domestic violence services, Lester testified she could not agree respondent was progressing in her domestic violence services.

¶ 19        When asked about respondent's completion of her parenting/visitation services, Lester stated respondent successfully completed parent education but still needed to complete attachment therapy. However, attachment therapy could not begin until closer to a physical return home, and since respondent did not have an appropriate home for E.N. to return to, attachment therapy never began.

¶ 20        Lester agreed Nicholas participated in this case by communicating with caseworkers and engaging in substance abuse services through Treatment Alternatives for Safe Communities (TASC). He was satisfactorily discharged from TASC in June 2022 and began domestic violence counseling in March 2023. Lester admitted she was unaware if Nicholas had any charges or convictions for domestic violence. She also never observed any physical violence or threats between Nicholas and respondent. Additionally, respondent told Lester "there has never been anything physical between them."

¶ 21                    c. Cross-Examination by the Guardian *ad Litem*

¶ 22        In January 2022, Nicholas came to court, and the judge admonished him he needed to participate in services. However, even after receiving this admonishment, he did not begin domestic violence counseling until March 2023. Although he provided drug screens at TASC and was satisfactorily discharged from that program, those drug screens were scheduled in advance

and not random. Except for one instance, he refused to complete random drug screens throughout the pendency of the case. On the one occasion Lester was able to collect a random sample from Nicholas, it was positive for amphetamines and tetrahydrocannabinol.

¶ 23    Following Lester's testimony, the State rested.

¶ 24    *2. Respondent's Evidence*

¶ 25    Without objection, respondent's counsel introduced a copy of Nicholas's integrated assessment and a list of some of his drug screens at TASC. Respondent did not present any additional evidence during the fitness hearing.

¶ 26    *3. Trial Court's Findings*

¶ 27    The trial court determined the State met its burden by clear and convincing evidence as to all three counts alleged in the petition to terminate parental rights.

¶ 28    As to counts I and II, the trial court found, while respondent "did show interest and concern as to [E.N.]'s welfare," she failed to maintain a degree of responsibility and failed to make reasonable progress toward a return home goal during the time frames specified in the State's petition. Although respondent made progress with her substance abuse issues, she failed to make reasonable progress with respect to her mental health and the underlying domestic violence issues. As to the underlying domestic violence issues, the reason the case came into care was due to a domestic violence incident between Nicholas and respondent where he was the perpetrator. The court found respondent made an affirmative choice to remain in a relationship with Nicholas, even after numerous admonishments that he was actively hindering her progress toward a return home goal. According to the court, respondent "made no effort to separate herself from that environment."

¶ 29    With respect to count III, the trial court found the State met its burden through the

admission of the indicated packet, which detailed "the incident *** that brought this matter into care." During this incident, respondent was holding E.N. and Nicholas began pushing and "dragging her around the house." The court noted this incident not only exposed E.N. to violence occurring between respondent and Nicholas, but also put E.N. "at risk of being harmed by their violence." While the indicated packet was the only evidence presented to prove the State's burden on count III, the court found it was reliable and uncontradicted by any testimony or other evidence. Based on this, the court found the State met its burden by clear and convincing evidence.

¶ 30                             B. Best Interests Hearing

¶ 31        At the outset of the hearing, the State requested the trial court take judicial notice of the unfitness proceedings and the best interests court report filed on September 1, 2023. After the court agreed to do so, the State indicated it would not be presenting further evidence. Respondent's counsel presented testimony from respondent.

¶ 32                             1. *Testimony of Respondent*

¶ 33        Respondent detailed the close relationship and bond she had with E.N., along with how she engaged in visits throughout the case. During those visits, she and E.N. would play with toys and watch videos together. According to respondent, her visits with E.N. "mean everything to [her]." Respondent's counsel offered into evidence several photographs taken by respondent during her visits with E.N.

¶ 34        Respondent's counsel then inquired about "[t]he night that brought this case into care." Respondent testified she was not injured, and it never would have happened if she and Nicholas were sober. Since that night, there have not been any other "physical incidents" between her and Nicholas.

¶ 35        When asked if she ever attempted to leave Nicholas, respondent stated she did

attempt to locate her own housing; however, Nicholas provided her with necessary financial and emotional support, so she never ended their relationship.

¶ 36    As of September 5, 2023, respondent had been sober for 846 days and maintained sobriety. Her sobriety had improved her life, and she insisted she would be a better parent to E.N. now that she was sober. She believed Larson was also sober and was currently involved in domestic violence counseling.

¶ 37    2. *Physical Evidence from the Guardian ad Litem*

¶ 38    Following respondent's testimony, the guardian *ad litem* offered into evidence photographs from the foster parents depicting their relationship with E.N., along with a letter expressing their desire to adopt E.N. The court admitted the same.

¶ 39    3. *Trial Court's Findings*

¶ 40    Following the parties' arguments, the trial court found the State met its burden by a preponderance of the evidence it was in E.N.'s best interests for respondent's parental rights to be terminated. The court based its decision on the statutory factors outlined in the best interests court report, along with respondent's testimony. Although it was clear to the court respondent loved E.N., E.N. had been in the same foster home for 24 months and formed a bond with her foster family. Furthermore, based on respondent's lack of progress, it was unlikely there would be any reunification between respondent and E.N. in the near future. After announcing its decision, the court entered a written order terminating respondent's parental rights and naming DCFS guardian of E.N. with the power to consent to adoption.

¶ 41    This appeal follows.

¶ 42    II. ANALYSIS

¶ 43    On appeal, respondent contends the trial court's (1) finding of unfitness and (2) best

interests finding were against the manifest weight of the evidence. We address each argument in turn.

¶ 44    At the outset, we find it important to discuss respondent's argument regarding the relevancy of statements made or entered into evidence during the permanency review hearings. Respondent contends these statements are relevant to our determination of whether the trial court abused its discretion in finding respondent was an unfit parent. However, as this court has previously stated, "[b]ecause of the different evidentiary rules governing fitness hearings and permanency hearings, evidence and orders from permanency hearings may not be considered by a trial court at the fitness portion of the termination proceedings." *In re Dar. H.*, 2023 IL App (4th) 230509, ¶ 49. For that reason, "this court will not reverse a trial court's fitness findings based on evidence presented at the permanency hearings; instead, we review the trial court's findings based solely on evidence presented at the fitness hearing." *Id.*

¶ 45                    A. Finding of Parental Unfitness

¶ 46    The Juvenile Court Act sets forth a two-stage process for the involuntary termination of parental rights.

¶ 47    At the first stage, "the focus is on the parent's conduct relative to the ground or grounds of unfitness alleged by the State." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). "[T]he State must *** demonstrate by clear and convincing evidence that the parent is 'unfit' under one or more of the grounds set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2004))." *In re Veronica J.*, 371 Ill. App. 3d 822, 828 (2007). On review, this court "accords great deference to a trial court's finding of parental unfitness, and such a finding will not be disturbed on appeal unless it is against the manifest weight of the evidence." *In re H.D.*, 343 Ill. App. 3d 483, 493 (2003). "A decision is against the manifest weight of the evidence when the opposite conclusion

is clearly apparent." *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 48.

¶ 48    In this case, the trial court found the State met its burden by clear and convincing evidence as to all three counts alleged against respondent. It found respondent (1) failed to make reasonable progress toward a return home goal within the time periods alleged by the State, (2) failed to maintain a reasonable degree of responsibility as to E.N.'s welfare, and (3) failed to protect E.N. from conditions within the environment injurious to E.N.'s welfare. Although the court found the State met its burden as to all counts, "[a] parent's rights may be terminated if even a single alleged ground for unfitness is supported by clear and convincing evidence." *In re Gwynne P.*, 215 Ill. 2d 340, 349 (2005).

¶ 49    Here, respondent concedes "the trial court properly found that the indicated packet describing the incident at the outset of the case was unrebutted. [Citation]. Therefore, there was a factual basis for the unfitness finding under [count III]." Respondent maintains her concession in her reply brief as well, stating, "this Court is bound under vertical *stare decisis* to follow the decisions of the [Illinois] Supreme Court, and based on [*In re C.W.*, 199 Ill. 2d 198, 216 (2002)], the trial court's finding on environment injurious must be conceded." Although respondent has made this concession, it is well-settled that courts of review are not bound by a party's concession. *People v. Carter*, 2015 IL 117709, ¶ 22. We will conduct our own review to determine whether respondent's concession is supported by the evidence.

¶ 50    In this case, count III of the State's petition was brought pursuant to section 1(D)(g) of the Adoption Act (750 ILCS 50/1(D)(g) (West 2022)). Under this section, the State must prove a parent is unfit in that the parent failed "to protect the child from conditions within his environment injurious to the child's welfare." *Id.* At the fitness hearing in this case, the State introduced a certified copy of the indicated packet from DCFS. This packet detailed the domestic

violence and substance abuse issues which occurred within the minor's residence. The trial court found that although this was the only evidence presented to support the State's burden on count III, because it was unrebutted, it was sufficient to meet the State's burden. After a review of the record, we find nothing in the record to contradict the court's findings. The indicated report provided a detailed summary of the domestic violence incident which occurred on May 12, 2021, while E.N. was present in the home, as well as respondent's admission to substance abuse. This evidence alone is sufficient to establish respondent failed to protect E.N. from injurious conditions within her environment, namely exposure to domestic violence and substance abuse. *Id*. Furthermore, although the indicated packet provided evidence only as to the original injurious environment respondent failed to protect E.N. from, it is well-settled

> "[t]here exists no requirement *** that a respondent be permitted a period of time to correct or improve an injurious environment before she may be found unfit on this ground. [Citation.] Thus, a parent's actions before the child was removed may serve as a basis for terminating his or her parental rights without forewarning." *Veronica J.*, 371 Ill. App. 3d at 831.

Therefore, the State was not required to present any additional evidence as to a continuing failure to protect or a period of time provided to respondent to correct the injurious environment before her rights could be terminated under section 1(D)(g) of the Adoption Act (750 ILCS 50/1(D)(g) (West 2022)).

¶ 51 After a full review of the record, we accept respondent's concession as to count III of the State's petition. We find nothing in the record to support the opposite conclusion by the trial court as to respondent's failure to protect E.N. from an injurious environment. Because the State need only meet its burden as to one count of unfitness to support the termination of parental rights,

- 12 -

we will not address the remaining two counts alleged in the State's petition. Instead, we turn to whether the court properly found it was in E.N.'s best interests that respondent's parental rights were terminated.

¶ 52                              B. Best Interest Determination

¶ 53       If after a fitness hearing, the trial court determines a parent to be unfit, "the court then determines whether it is in the best interests of the minor that parental rights be terminated." *D.T.*, 212 Ill. 2d at 352. "At the best-interest portion of a termination hearing, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest." *In re J.B.*, 2019 IL App (4th) 190537, ¶ 31. When determining if the State has met its burden, the court should consider the following statutory factors:

> " '(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least[-]disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child.' " *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 52 (quoting *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072 (2006) and citing 705 ILCS 405/1-3(4.05) (West 2014)).

¶ 54       As with a review of a court's finding of unfitness, "[a] reviewing court [also] affords great deference to a trial court's best-interest finding because the trial court is in a superior

position to view the witnesses and judge their credibility." *J.B.*, 2019 IL App (4th) 190537, ¶ 33. "A trial court's finding that termination of parental rights is in a child's best interests will not be reversed on appeal unless it is against the manifest weight of the evidence." *In re M.C.*, 2018 IL App (4th) 180144, ¶ 35. "A decision is against the manifest weight of the evidence when the opposite conclusion is clearly apparent." *Ta. T.*, 2021 IL App (4th) 200658, ¶ 48.

¶ 55         In this case, the trial court made it apparent it weighed not only respondent's testimony but also the statutory factors set forth in the best interests court report, which are identical to the ones enumerated in section 405/1-3(4.05) of the Juvenile Court Act. See 705 ILCS 405/1-3(4.05) (West 2022). The court placed emphasis on E.N.'s relationship and bond with her foster family, whom she had been with for over two years. The foster parents provided for all of E.N.'s needs and were willing to adopt and provide stability and permanency for E.N. Conversely, while respondent clearly cared for E.N. and wanted a relationship with her, because of respondent's lack of progress, she did not have a stable home for E.N. and lacked permanency for E.N.

¶ 56         Based on this evidence, we find the trial court's best interests finding was based on an appropriate consideration of the statutory factors. Furthermore, respondent failed to identify any facts which clearly demonstrated the court should have reached the opposite conclusion. Accordingly, we conclude the court's best interests finding was not against the manifest weight of the evidence.

¶ 57                         III. CONCLUSION

¶ 58         For the reasons stated, we affirm the judgment of the trial court.

¶ 59         Affirmed.